Filed 12/16/24  P. v. Chase CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B325424 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA064957) |
| v. | |
| ERIN HOSEJOSHUA CHASE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge. Affirmed.

Susan Morrow Maxwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

In 2014, appellant Erin Hosejoshua Chase and codefendants Jason West and Reginald Young attempted to rob victim Marc Spinner under the guise of buying marijuana from him. During the course of the attempted robbery, Young fatally shot Spinner. Appellant pled no contest to first degree murder and was sentenced to 25 years to life.

In 2019, appellant filed a petition for resentencing under Penal Code section 1172.6 (former section 1170.95).[1] Following appointment of counsel and briefing, the superior court denied the petition at the prima facie stage. A different panel of this court reversed and remanded the matter for an evidentiary hearing. On remand, the parties submitted further briefing and the superior court held an evidentiary hearing. The court again denied the petition, finding that appellant was not eligible for relief because he was a major participant and acted with reckless indifference to human life.

Appellant contends the court erred by denying his resentencing petition. He argues that the court relied on inadmissible evidence, including police reports and hearsay statements in the preliminary hearing transcript. Even including the challenged evidence, appellant contends that there was insufficient evidence to support the court's finding that he was a major participant and acted with reckless indifference. We find that appellant has not established any prejudicial error in the admission of evidence at his evidentiary hearing. Further, substantial evidence supports the superior court's finding that appellant was a major participant in the underlying attempted robbery and acted with reckless indifference to human life. We therefore affirm.

## FACTUAL BACKGROUND

Because appellant did not proceed to trial, the relevant facts considered by the superior court at the evidentiary resentencing hearing were drawn from the transcript of appellant's preliminary hearing, transcripts of police interviews with Young and appellant, and police reports. We summarize this

---

[1] Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute. We hereafter refer to the statute as section 1172.6. All further statutory references are to the Penal Code unless otherwise indicated.

evidence here, then discuss further below the propriety of the court's reliance on certain challenged portions for purposes of resentencing under section 1172.6.

## I.    Preliminary Hearing

The 2015 preliminary hearing included testimony from a single witness, Detective Louie Aguilera, a homicide investigator with the Los Angeles County Sheriff's Department (LASD). Aguilera testified that he arrived at the victim's home early in the morning on June 28, 2014. The garage door was partially open. Inside the garage, Aguilera saw three shell casings, consistent with a .45 caliber firearm, on the floor of the garage near the access door leading into the home. He also observed five gunshot holes in the access door, some in the middle of the door and some near the door handle. He and the other investigators determined that the shots were fired from the garage into the house. The access door was closed and unlocked. The door could not be opened from the garage, as it was blocked from the other side by Spinner's body.

Aguilera described the layout of Spinner's house. He observed Spinner's body in the hallway, near the access door to the garage, with an apparent head wound. Spinner had duct tape on one ankle and one wrist. Aguilera also saw a safe on the floor in the hallway near the access door. The safe was on its side, partially blocking the hallway. Inside the safe, Aguilera found multiple bottles of prescription pills, cash, and marijuana in jars. In Spinner's bedroom, Aguilera found marijuana paraphernalia and a "rifle/BB gun" leaning against one wall. Aguilera also testified that the coroner told him that Spinner suffered three gunshot wounds, including a fatal wound to his head.

At some point, Aguilera's investigation focused on Young. Aguilera testified about his interview with Young, which we detail below. Aguilera also answered questions from appellant's counsel regarding his interview with appellant.

## II.    Young's Interview

Detective Aguilera and another officer interviewed Young at the sheriff's station on December 16, 2014. Young stated that he was previously arrested in July for selling drugs and possessing a gun in his car. He initially

denied knowing Spinner or ever visiting his house. Aguilera told Young that witnesses had identified him running from Spinner's house and that the gun he was arrested with had been used to shoot Spinner. The interview was paused after Young remained reluctant to provide any information, citing concern for his family and not wanting to be considered a "snitch."

The interview resumed a few hours later. Young admitted that he was present the night of the shooting. That day, Young was hanging out with West, who is his wife's sister's boyfriend. West called him a few days prior and said he knew a guy who could bake weed into another marijuana product called "Wax." The day of the shooting, Young, West, and appellant (Young's cousin) were hanging out, when West suggested going to see Spinner because West wanted to buy some Xanax "bars." The three of them went to Spinner's house. Young originally stated that they did not plan to rob anyone and that West did not go inside. Later in the interview, he admitted that he and West had a discussion in the car "about [Spinner] having stuff in the house. So, I guess you could say yes, we did plan to rob it." On the drive there, West told Young and appellant that Spinner had two safes in his room and made Spinner seem like a big drug dealer. Young also admitted that West "knew that I liked firearms."

When they arrived at Spinner's house, West went in first and bought Xanax bars. They did not park in front of the house, because West said he did not know if Spinner would be okay with him bringing other people. After West came back to the car, he told Young and appellant to knock on the door and meet Spinner. During the interview, Young said when he thought about it afterward, he thought that West was telling them about Spinner's cash and drugs so that they would rob Spinner. The three men spoke for about 10 to 15 minutes in the car. Young and appellant then went to meet Spinner. Young had his gun in his front waistband.

The garage door was halfway open, so appellant and Young went into the garage and knocked on the interior door. When Spinner opened the door, Young told him they wanted to talk about buying weed. At Spinner's invitation, they went into his room to smoke weed. Young said Spinner's behavior became "fishy" and Spinner accused them of trying to rob him. Young admitted that he had his gun with him, and that he often carried it

4

because he had cash and drugs on him. Young claimed that appellant saw a rifle in the corner of the room and Spinner began moving toward it, so they began to fight. Young grabbed Spinner and they started "scuffling." Spinner grabbed the rifle and then Young snatched it from him, threw it on the bed, and told Spinner to "chill out" because they were just trying to leave. Appellant then started hitting Spinner with his fists. Young pushed Spinner off of himself and told appellant to "go." Young and appellant left the bedroom and headed toward the door back to the garage, with appellant in the lead. Young then saw Spinner coming around the corner holding the rifle and "I felt like it was me or him and I just pulled the trigger." He explained that he went through the door into the garage, turned around, and saw Spinner approaching as the door swung shut, so he then fired multiple shots at Spinner through the door.[2] He did not see whether he hit Spinner with any shots. Young and appellant then ran down the driveway; he put his hoodie up as he ran because he noticed the garage door next door was open. Appellant also had his sweatshirt hood up. They jumped back into the car and left.

When Aguilera asked him about the duct tape, Young admitted that appellant duct taped Spinner's wrists as they were trying to leave. When they first walked into the bedroom, Young looked around but did not see the big safes that West had described. As Spinner started to get aggressive, Young decided that they should tie him up and leave. They used a roll of duct tape that was on the dresser. Young admitted that he took out his gun at this point to get Spinner to comply while being restrained. They had Spinner sit on the bed, Young pointed the gun at him, and appellant duct taped his wrists. Then appellant "insists on grabbing the safe," and "takes off running." Appellant later told Young he dropped the safe because he could not open the door to the garage while carrying it. Young said when he shot it was a "him or me type situation," but he did not think he had hit Spinner, just "scared him off enough so he wouldn't come out."

---

[2] Aguilera testified during the preliminary hearing that his observation of the rifle in Spinner's room was not consistent with Young's claim that Spinner came into the hallway holding the rifle. He also testified that no other weapons were found in the home.

## III.   Appellant's Interview

Aguilera and another officer interviewed appellant on January 15, 2015 at the sheriff's station.  Appellant explained that on the day of the incident, which was also the day before his 18th birthday, he and Young were planning to buy alcohol, weed, and "Xani bars," a form of Xanax.  Young, along with West, picked up appellant  around 7:00 pm and they drove to Young's house.  They smoked some weed for a few hours and then left in Young's Camaro.  West said he knew where to get Xani bars.  West said that he knew Spinner, who was a drug dealer.  Appellant also acknowledged West telling him that Spinner had money and "this and that," but appellant "wasn't really paying attention. . . .  I wanted to just enjoy my birthday and that's it."

They drove to Spinner's house and appellant thought they might have parked a few houses down the street so that West could see if Spinner was home.  Appellant stated that he could not recall, but West "might have" gone into the house alone first, while appellant and Young stayed in the car.  Then West returned and waited in the car while appellant and Young went into Spinner's house.  Appellant stated that the plan was to "get the bars and leave and that's it."  Appellant denied planning to rob Spinner; he said that he decided to go along to buy the drugs because he had never seen Xani bars.  Appellant stated that he knew Young owned a gun but did not know he had it with him that night.

West called Spinner to let him know that appellant and Young were coming in to buy bars.  The garage door was halfway open and Spinner met them at the door and took them to his room.  Appellant identified a photo of Spinner during the interview.

Appellant recalled that they walked into Spinner's bedroom and Spinner shut the door behind them.  They spoke for about five minutes, while Spinner showed them different drugs and told them about bars and that he made "wax" from marijuana.  Appellant was standing by the door during this conversation.  Appellant also saw a small safe on the floor of a closet. He said that Spinner took the safe out and told them that was where he kept the wax, "Xani's, everything was in the safe."

6

At some point, Spinner and Young started arguing and Young accused Spinner of "trying to play" them. Appellant was worried because he did not know what Spinner might do, so he opened the bedroom door and tried to pull Young into the hallway. Young and Spinner started pushing each other. Appellant opened the garage door to leave but then he heard gunshots. Appellant was scared because he did not know who was shooting, so he started running to the car. Young caught up and told him that he "started shooting." Appellant later stated that when they got to the car, Young said he had a gun "but he never told me he fired." Appellant thought maybe Young and Spinner were shooting at each other. He never saw Spinner with a gun. Appellant stated that in the car, West asked what happened, Young said "He shot at me," and might have said that he shot back at Spinner. Appellant learned the next day that Spinner had died.

After Aguilera told appellant during the interview that they had evidence that appellant had punched Spinner and helped restrain him with duct tape, appellant explained that Spinner seemed to be on drugs and became aggressive during the argument. Appellant admitted punching Spinner after Spinner pushed Young, while they were still in the bedroom. As they were struggling, Young told appellant to restrain Spinner using some duct tape that was on a dresser. Appellant denied that Young pulled out a gun while appellant was still in the bedroom. Appellant said that Young held Spinner from behind while appellant taped his wrists so that they could leave. Appellant tried to tape his ankles, but Spinner started to break free, so appellant decided "fuck this, I'm out of here." Appellant grabbed Young and they started to leave. He reiterated that as he stepped through the garage door, he heard two or three gunshots and began to run. Appellant also said that he moved the safe from the bedroom as he was leaving and while Spinner and Young were fighting because "I don't want nobody to trip over it." He set the safe down by the garage door.

## IV. Police Reports

The reports in the record include a supplementary report from the LASD dated January 12, 2015, which consisted of a catalogue of evidence recovered from the scene, summary of the investigation, statements from witnesses and the coroner, and summaries of interviews with Young's wife,

7

Young, West, and appellant. There is also an LASD crime scene investigation report, two LASD laboratory examination supplemental reports regarding examination of Young's gun, and LASD biological evidence and DNA reports.

## PROCEDURAL HISTORY

### I. Conviction and Sentence

An amended information in July 2015 charged appellant and codefendants Young and West with the murder of Marc Spinner (§ 187, subd.(a); count one), attempted robbery (§§ 211, 664; count two), and first degree burglary, person present (§ 459; count three). The information alleged the special circumstance that as to all three counts, the codefendants committed murder while engaged in the commission of an attempted robbery (§ 190.2, subd. (a)(17), and that a principal was armed with a firearm (§ 12022, subd. (a)(1)), as well as additional firearm allegations against Young.

In June 2017, appellant pled no contest to first degree murder. Defense counsel joined in the plea and stipulated to a factual basis based on the preliminary hearing transcripts and police reports. The court found a factual basis for appellant's plea and accepted the plea.

The court sentenced appellant to 25 years to life in state prison. The court dismissed the remaining charges and allegations pursuant to the plea.

### II. Section 1172.6 Proceedings

#### A. *Initial Petition*

Appellant filed a section 1172.6 petition, which the superior court denied at the prima facie stage. Appellant appealed. In a prior unpublished opinion, a different panel of this court agreed with the parties that appellant had established a prima facie right to relief and that remand was therefore warranted for an evidentiary hearing. (*People v. Chase* (Dec. 17, 2020, B303172).)

#### B. *Filings on Remand*

On remand, the superior court issued an order to show cause and ordered further briefing. The People filed a supplemental opposition, arguing that appellant was ineligible for relief because he was a major participant in the attempted robbery and acted with reckless indifference to Spinner's life.

The opposition included a statement of facts "taken from the police reports, preliminary hearing transcripts, audio recorded statements of the petitioner and his co-conspirator, and other evidence attached to this motion." The People attached as exhibits the LASD reports, and transcripts and a CD of the recorded statements from appellant and Young.

Appellant filed a reply brief in January 2022. He argued that the court should consider his youth at the time of the crime as a mitigating factor. Based on the consideration of his youth, he contended that there was insufficient evidence to establish that he was a major participant acting with reckless disregard for human life. Appellant also filed a "brief re admissibility of evidence" in advance of the evidentiary hearing. He acknowledged that the preliminary hearing transcript was admissible at the hearing as "part of the record of conviction." However, he objected to the admissibility of other evidence including "police reports, probation reports, recorded interviews, forensic reports, and sentencing memoranda" because those documents were not part of the record of conviction, contained inadmissible hearsay, and violated appellant's sixth amendment right to confrontation. He also objected to "[h]earsay related by a peace officer in a Prop. 115 preliminary hearing."

### C.     *The hearing and decision*

The court held the evidentiary hearing on April 29, 2022, which appellant attended by video conference. The prosecutor argued that the court could consider the preliminary hearing transcript and the documents attached to the opposition brief because they were "reliable hearsay." He also noted that appellant and his counsel had stipulated to the factual basis for the plea based on the preliminary hearing transcript and the police reports. Based on that evidence, the prosecutor argued that appellant was ineligible for relief. He stated that appellant's conviction was premised on felony murder and that appellant could still be convicted of murder as he was a major participant in the robbery and acted with reckless disregard for life. In particular, the prosecutor pointed to evidence that appellant carried the safe into the hallway during the robbery and assisted in duct taping Spinner while Young held him at gunpoint.

9

Appellant's counsel submitted on his admissibility brief. Neither party offered additional evidence. The court stated it had received appellant's brief regarding admissibility and took the matter under submission.

The court issued a decision on July 15, 2022, denying appellant's petition. The court indicated it had reviewed the pleadings and was taking judicial notice of the record from the court case file pursuant to Evidence Code section 452, subdivision (c). The court noted that as charged, appellant "was facing conviction of three violent felonies," but had accepted a plea after "extended conversations between the prosecution and the defense." Turning to admissibility, the court found that where a petitioner stipulated to the preliminary hearing transcript and police reports as a basis for a plea, the court could rely on the evidence presented in those documents at the evidentiary hearing. In addition, the court found that appellant's statements to the police were admissible as a party admission under Evidence Code section 1220. The court further found that "the admission of a co-conspirator, while participating in a conspiracy to commit a crime and in furtherance of the objective of that conspiracy, also is admissible, pursuant to Evidence Code section 1223."

Considering this evidence, including the sheriff's reports and preliminary hearing transcript, the court made the following findings:

"[Appellant] and his co-defendants conspired to commit the underlying felony, a pre-planned home-invasion robbery of a known drug dealer. . . . Prior to the commission of the crimes, [appellant] and his co-defendants spent a considerable amount of time together. They also engaged in planning activities, discussing the money and drugs they expected the victim to have in his possession. [Appellant] admitted his cousin, co-defendant Young, was known to have a gun.

"According to their plan, [appellant] and his co-defendants arrived together at the victim's house, but parked away from the location. Co-defendant West initially went to the victim's house alone, under the pretext that he was there to buy drugs, when he actually was casing the location. Co-defendant West knew the victim did not permit strangers into the house, but while he was there, he facilitated [appellant] and co-defendant Young's

10

eventual entry into the house, by asking the victim if his two friends could come by to purchase marijuana.

"Co-defendant West left the victim's house, and met up with [appellant] and co-defendant Young, informing them that the victim was home, and had drugs and safes in his room containing drugs and money. Upon receiving that information, [appellant] and co-defendant Young entered the victim's home, claiming they were there to buy marijuana. While inside the house, in the bedroom where a safe was visible, after the victim got suspicious and asked the men to leave, a physical struggle ensued between the victim, [appellant], and co-defendant Young. To 'settle' the victim, co-defendant Young pointed his gun at the victim, telling him to stop struggling. In a taped police interview, [appellant] admitted that, at that point, he personally duct taped the victim's wrists and feet while co-defendant Young held the victim at gunpoint. In addition, petitioner admitted that, after he duct-taped the victim, he personally removed the heavy safe from the closet in the victim's bedroom, taking it into the hallway that leads to the back door of the house.

"[Appellant and Young] were in the process of fleeing with the safe, still in the house, when the victim was able to partially break free of his duct tape restraints. [Appellant] dropped the safe in the hallway, and co-defendant Young shot the victim as he and [appellant] fled through the garage. [Appellant], co-defendant Young, and co-defendant West all fled the scene together. No one called for help or rendered aid. The victim died from the gunshot wounds he sustained."

Citing the factors under *People v. Banks* (2015) 61 Cal.4th 788, 803 (*Banks*), the court found "beyond a reasonable doubt that [appellant], although not the actual killer, was indeed a major participant in the underlying felony, from its planning through its execution." In addition, applying the factors to determine whether a defendant acted with reckless indifference to human life, as set forth in *People v. Clark* (2016) 63 Cal.4th 522, 617-623 (*Clark*), the court found beyond a reasonable doubt that appellant "was a major participant in the underlying felony who acted with reckless indifference to human life." Thus, because appellant could still be

11

convicted of murder, the court found he was ineligible for resentencing. The court accordingly denied his petition.

Appellant timely appealed.

## DISCUSSION

### I.  Governing Law

Effective January 1, 2019, the Legislature "'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'"  (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*), quoting Stats. 2018, ch. 1015, § 1(f).) As amended, section 188, subdivision (a)(3) now provides that "in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)  Section 189 now provides that a participant in qualifying felonies during which a death occurs generally will not be liable for murder unless (1) he or she was "the actual killer," (2) he or she, "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree," or (3) he or she "was a major participant in the underlying felony [who] acted with reckless indifference to human life." (§ 189, subds. (e)(1)-(3); accord, *People v. Wilson* (2023) 14 Cal.5th 839, 868–869.)

A person convicted of murder or attempted murder under a now-invalid theory may petition the superior court under section 1172.6 to vacate the conviction and be resentenced on any remaining counts.  (§ 1172.6, subd. (a).)  An offender seeking resentencing must first file a petition in the sentencing court, and the court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief.  (§ 1172.6, subds. (a)– (c).)  If the superior court determines the petitioner has made such a showing, the court must issue an order to show cause and hold an evidentiary hearing at which the prosecution bears the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under current law. (§ 1172.6, subds. (c), (d)(3)).  "In addition to evidence admitted in the petitioner's prior trial, both '[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.'  [Citation.] 'If the prosecution fails to sustain its burden of proof, the prior conviction,

13

and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.'" (*Wilson, supra,* 14 Cal.5th at p. 869, quoting § 1172.6, subd. (d)(3).)

We review the superior court's findings following the evidentiary hearing for substantial evidence, and the application of those facts to the statute de novo. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412; see also *People v. Clements* (2022) 75 Cal.App.5th 276, 298 [job of reviewing court "is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt"].)

## II. Admissibility at Evidentiary Hearing

Appellant contends that the superior court erred at his evidentiary hearing by relying on the LASD reports and portions of the preliminary hearing transcripts, as they contained inadmissible hearsay. To the extent the court erred, we conclude any error was harmless.

At the evidentiary hearing, the admissibility of evidence is governed by section 1172.6, subdivision (d)(3) (§ 1172.6 (d)(3)). Under that section, "[t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule." (§ 1172.6 (d)(3).)[3] Put another way, section 1172.6 (d)(3) creates a hearsay exception for witness testimony that was admitted at any prior hearing, including witness testimony admitted at a preliminary hearing. (See *People v. Davenport* (2023) 95 Cal.App.5th 1150, 1158.) However, this exception significantly excludes hearsay statements related by law enforcement officers at a

---

[3]    Section 872, subdivision (b) permits a law enforcement officer to testify at a preliminary hearing as to "statements of declarants made out of court offered for the truth of the matter asserted."

14

preliminary hearing pursuant to section 872, subdivision (b), unless that evidence is otherwise "admissible pursuant to another exception to the hearsay rule." (§ 1172.6 (d)(3).)

Appellant challenges the superior court's consideration of evidence contained in the LASD reports and preliminary hearing transcript as bases to determine his ineligibility for resentencing.[4] With respect to the LASD reports, appellant contends that they contain multiple levels of hearsay. (See, e.g., *People v. Sanchez* (2016) 63 Cal.4th 665, 674.) He further argues that even if the statements contained within the reports are admissible, the reports themselves are hearsay and do not qualify under an exception to the hearsay rule. (*People v. McVey* (2018) 24 Cal.App.5th 405, 415 ["As a general rule, police reports do not fall under the business records exception."]; see also *People v. Sanchez, supra*, 63 Cal.4th at p. 695, fn. 21 ["When a record is not made to facilitate business operations but, instead, is primarily created for later use at trial, it does not qualify as a business record."].)

Respondent does not argue that the LASD reports were admissible at the evidentiary hearing pursuant to section 1172.6 (d)(3), essentially conceding the issue. We agree this concession is proper. To the extent the superior court relied upon information in those reports to determine appellant's eligibility for resentencing at the evidentiary hearing, the court erred.[5]

---

[4]     We reject respondent's contention that appellant has forfeited these claims by failing to adequately develop them. Appellant objected below to the admission of these documents as hearsay. On appeal, he again challenges on hearsay grounds the admissibility of the LASD reports and the portions of the preliminary hearing transcript containing his co-defendants' statements. As such, appellant has adequately raised the issue to avoid forfeiture.

[5]     The superior court relied on cases holding that documents including the preliminary hearing transcript could be used at the prima facie stage to establish a petitioner's ineligibility where the petitioner stipulated to those documents as a part of the factual basis for a plea. (See *People v. Nguyen* (2020) 53 Cal.App.5th 1154, 1166; *People v. Davenport* (2021) 71 Cal.App.5th 476, 481.) Neither party has provided authority suggesting that the same analysis applies at the evidentiary stage, where admissibility is squarely governed by section 1172.6 (d)(3).

Appellant's challenge to the court's consideration of the preliminary hearing transcript is narrower. He does not dispute that portions of that transcript were admissible under section 1172.6 (d)(3). Specifically, Aguilera's testimony regarding his first-hand observations of the crime scene was not hearsay and was not admitted pursuant to section 872, subdivision (b). This testimony included Aguilera's discussion of the layout of Spinner's residence, the location and condition of the body, his observation of the safe on the hallway floor and the rifle in the bedroom, and the bullet casings and holes in and around the garage access door. Additionally, although Aguilera's testimony relating statements made by appellant was hearsay and thus subject to section 872, subdivision (b), it was otherwise admissible as a party admission pursuant to Evidence Code, section 1220.

Instead, appellant principally challenges the court's consideration of Aguilera's testimony regarding statements made by Young. The superior court found these statements subject to a hearsay exception as admissions of a coconspirator under Evidence Code section 1223. The parties dispute whether that finding was in error. We need not reach this issue as, even assuming the error, we would find the inclusion of this evidence harmless.

Evidentiary errors under state evidence rules are evaluated under the "reasonable probability" standard of prejudice announced in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (See *People v. Myles* (2021) 69 Cal.App.5th 688, 706 [applying *Watson* to admissibility errors in 1172.6 resentencing].) Under this standard, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable outcome had the evidence been excluded. (*Ibid.*)

We conclude that appellant has not established prejudice. Indeed, appellant states only that the admitted evidence was prejudicial because it was "used as part of the basis" of the court's ineligibility finding. This conclusory statement does not carry appellant's burden. Moreover, it is not reasonably probable that the court would have reached a different conclusion absent consideration of the LASD reports and the challenged portions of the preliminary hearing transcript. The majority of the evidence supporting the superior court's findings, which we discuss further below, was contained in the admissible portion of the preliminary hearing transcript—Aguilera's own

16

observations and appellant's statements—as well as Young's interview, which appellant does not challenge on appeal. As such, we find no prejudicial error.[6]

## III. Finding of Reckless Indifference

Appellant also contends that even assuming all of the evidence was properly admitted, the superior court lacked substantial evidence to find that he acted with reckless indifference to human life. We review the superior court's findings for substantial evidence (see *People v. Clements, supra,* 75 Cal.App.5th at p. 298), and conclude that the record supports the court's finding of ineligibility.

It is undisputed that appellant was not the actual shooter and was charged and convicted of first degree murder under a felony murder theory based on the attempted robbery. Therefore, to sustain appellant's murder conviction under section 1172.6, the prosecution had the burden of proving beyond a reasonable doubt that appellant was a major participant in the attempted robbery and acted with reckless indifference to human life. (§ 1172.6 (d)(3).) Appellant does not challenge the superior court's finding that he was a major participant; thus, the key query is whether he acted with reckless indifference to human life.

"Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'" (*In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*).) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not desire that death as the outcome of his actions." ( *Clark, supra*, 63

---

[6]    In a footnote, appellant contends that the admission of "statements by appellant's codefendants to the police" violated his right to confrontation pursuant to *Crawford v. Washington* (2004) 541 U.S. 36. We agree with respondent that appellant's cursory reference to *Crawford* in a footnote is not sufficient to preserve the issue for consideration on appeal. (See *Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947 ["Footnotes are not the appropriate vehicle for stating contentions on appeal."]; *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 624, fn. 2 ["We do not view as adequate to preserve an issue on appeal . . . one footnote mention of [it]"]; see also *Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236, 1260, fn. 10 [argument raised in footnote without analysis or discussion is waived].)

17

Cal.4th at p. 617.) Reckless indifference to human life has both subjective and objective components. (*Ibid*.; see also *Scoggins, supra*, 9 Cal.5th at p. 677.) "As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'" (*Scoggins, supra*, 9 Cal.5th at p. 677.) "As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'" (*Ibid*.) A defendant must knowingly create a grave risk of death to act with reckless indifference to human life; mere awareness of the foreseeable risk of death inherent in any violent felony is not enough. (*Ibid*.)

Whether a defendant acted with reckless indifference to human life depends on the totality of the circumstances. (*Scoggins, supra*, 9 Cal.5th at p. 677.) Relevant factors enumerated in *Clark, supra*, 63 Cal.4th at pp. 618-623 include, "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra*, at p. 677.) None of these considerations is necessary, nor is any necessarily sufficient, to establish reckless indifference. (*Ibid*.) Ultimately, the determination of whether a defendant acted with reckless indifference to human life is "a fact-intensive, individualized inquiry." (*Id*. at p. 683.)

Applying the factors identified by *Clark*, and viewing the totality of the circumstances, we conclude the record contains sufficient evidence from which the superior court could conclude beyond a reasonable doubt that appellant acted with reckless indifference to human life. Regarding the first factor related to the use of weapons during the crime, appellant admitted to

18

Aguilera that he knew Young had a gun and Young admitted that he often carried his gun with him. Although appellant claimed he did not know Young had a gun that night, he became aware of that fact, at the latest, when Young pulled out his gun during the scuffle with Spinner in the bedroom. After Young pointed the gun at Spinner, appellant continued to assist in the attempted robbery, first using duct tape to restrain Spinner's arms and legs and then taking the safe into the hallway.

Appellant points to the fact that the only evidence of a gun used in the attempted robbery was the firearm wielded by Young, citing cases holding that the "mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at pp. 613, 618.) However, while there is no evidence that appellant personally used a gun, he ignores the evidence that he took steps beyond simply participating in an attempted robbery in which a confederate was armed. Rather, appellant participated in the fight by punching Spinner, then duct taped Spinner's hands and feet while Young pointed the gun at Spinner, and then ran from the bedroom with Spinner's safe. In addition, substantial evidence supports the superior court's finding that appellant, West, and Young spent time planning the robbery, including discussing the money and drugs that Spinner purportedly had and taking steps to avoid detection and to lure Spinner into letting them into his home under the guise of buying drugs. Based on this evidence, the court could reasonably conclude that appellant knew that Young would be armed and then assisted in Young's use of the weapon against the victim as part of the planned home-invasion robbery.

The second factor, appellant's physical proximity to the murder and the events leading up to it, also weighs in favor of the court's finding that he acted with reckless indifference to human life. "Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,]

19

the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'" (*Clark, supra*, 63 Cal.4th at p. 619.) Here, appellant was present with Young for the entire sequence of events starting with the request to buy drugs from Spinner, through the physical fight and subsequent restraint, to his attempt to take Spinner's safe and flee, and the ultimate shooting. As such, far from acting as a restraining influence on Young, the court could reasonably conclude that appellant assisted in the escalation of events culminating in Spinner's murder. Moreover, appellant made no attempt to aid Spinner, despite hearing multiple gunshots as he fled the house.

The third factor is the duration of the felony, particularly the duration of the interaction between victims and perpetrators; more prolonged incidents provide "'a greater window of opportunity for violence.'" (*Clark, supra*, 63 Cal.4th at pp. 620-621.) The court could reasonably conclude that this factor also weighed in favor of a finding of reckless indifference. Although both he and Young reported that Spinner became suspicious while they were in his bedroom, appellant did not withdraw but rather prolonged the interaction and increased the violence by engaging in a physical altercation with Spinner and then tying him up at gunpoint.

The superior court made no findings regarding the fourth factor—defendant's awareness of his codefendants' propensity for violence or likelihood of killing a victim. We agree that this factor weighs against the finding of reckless indifference.

Finally, the fifth factor is the defendant's efforts to minimize the risk of violence during the felony. As previously discussed, there was no evidence that appellant made any efforts to minimize the risk of violence. Instead, he was actively involved, punching Spinner and then restraining him while Young held him at gunpoint. As such, there was substantial evidence to support the court's finding that this factor weighed in favor of finding reckless indifference to human life.

Appellant also contends that the court erred in failing to expressly consider his age at the time of the crime as relevant to whether he acted with reckless indifference. It was well settled at the time of appellant's

20

evidentiary hearing that a defendant's youth at the time of the crime "is a relevant factor in determining whether the defendant acted with reckless indifference to human life." (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 987, citing *In re Moore* (2021) 68 Cal.App.5th 434, 453-454 (*Moore*).) This is because children generally lack the experience, perspective, and judgment of adults, and are also generally less responsible and mature. (*Moore, supra*, 68 Cal.App.5th at p. 453.) As with the other factors, youth alone is not dispositive. (*In re Harper* (2022) 76 Cal.App.5th 450, 470.) Appellant argued extensively in his briefing to the superior court that his youthful age at the time of the crime warranted a finding that he did not act with the reckless indifference necessary to sustain his conviction for murder. He contends that the court's failure to specifically mention any consideration of his age in its ruling requires reversal and remand. We disagree.

"[W]e presume the trial court followed the law in exercising its duties and duly considered the evidence presented to it." (*People* v. *Jones* (2022) 86 Cal.App.5th 1076, 1092.) This presumption derives from the "fundamental principle of appellate procedure," that "a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) "In the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence." (*Jones, supra*, 86 Cal.App.5th at p. 1092.) Here, we presume the court properly considered appellant's youth as part of its analysis, particularly given that appellant cited his immaturity and susceptibility to peer pressure as chief factors supporting his request for resentencing. Appellant's speculation to the contrary does not defeat that presumption. While appellant's youth was certainly relevant to the inquiry, "[t]he fact of youth cannot overwhelm all other factors." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 595.) We therefore affirm the superior court's finding that appellant was ineligible for resentencing under section 1172.6.

21

**DISPOSITION**

The order denying the petition for resentencing is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



CURREY, P.J.



ZUKIN, J.